# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

PAMELA DAVIES,                          :

      Plaintiff,                      :

        Case No. 3:12cv00355

  vs.                                   :

        District Judge Walter Herbert Rice

CAROLYN W. COLVIN,                      :   Chief Magistrate Judge Sharon L. Ovington
Acting Commissioner of the Social
Security Administration,                :

      Defendant.                      :

## REPORT AND RECOMMENDATIONS[1]

## I.   <u>Introduction</u>

Plaintiff Pamela Davies has worked as a Registered Nurse for nearly 20 years. In June 2007, she stopped working due to fibromyalgia and resulting pain as well as chronic fatigue syndrome, and other health problems. Nearly one year later, she applied for Disability Insurance Benefits asserting that she was under a benefits-qualifying disability beginning on June 25, 2007, when she was 55 years old.

The Social Security Administration denied Plaintiff's application through the written decision of Administrative Law Judge (ALJ) Thomas R. McNichols II (Doc. #6, PageID at 76-90). ALJ McNichols concluded that Plaintiff was not under a benefits-qualifying

---

[1] Attached hereto is a NOTICE to the parties regarding objections to this Report and Recommendations.

disability largely because she remained able to perform nearly the full range of medium work. Such work, by definition of the Social Security Administration, requires a person to be able to lift up to "50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. §404.1567(c). Medium work seems a tall order for at least some (but not all) who have reached age 55, especially when such work must be done during an 8-hour workday, 5 days per week.[2] Plaintiff asserts that it is too tall a work order for her due to daily and continuous fibromyalgia-caused pain as well as her other health problems.

She brings the present case challenging ALJ McNichols' non-disability decision. This case is before the Court upon Plaintiff's Statement of Errors (Doc. #8), the Commissioner's Memorandum in Opposition (Doc. #11), Plaintiff's Reply (Doc. #12), the administrative record (Doc. #6), and the record as a whole.

Plaintiff seeks an Order reversing the ALJ's decision and remanding the matter to the Social Security Administration for payment of benefits. The Commissioner seeks an Order affirming the ALJ's decision.

This Court has subject matter jurisdiction over the parties' dispute. *See* 42 U.S.C. §405(g).

---

[2] In the Social Security Administration view, a person's ability to perform work despite her or her limitations consists of work on a "regular and continuing basis...," meaning "8 hours a day, 5 days a week, or an equivalent work schedule." Soc. Sec. Ruling 96-8p, 1996 WL 374184 at *1 (July 2, 1996).

## II.      **"Disability" Defined**

The Social Security Administration provides Disability Insurance Benefits (DIB) to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York*, 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §423(a)(1)(D). The term "disability" – as defined by the Social Security Act – has specialized meaning of limited scope. It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job – *i.e.,* "substantial gainful activity," in Social Security lexicon.[3] 42 U.S.C. §423(d)(1)(A); *see Bowen*, 476 U.S. at 469-70.

## III.     **Evidence Before The Social Security Administration**

### A.      **Plaintiff's Testimony**

Plaintiff appeared and testified during a hearing conducted by the ALJ. She testified that she stopped working in June 2007 when she was terminated because of absenteeism. Her absences were due to "a lot of pain [and] memory problems." (Doc. #6, PageID at 101). At the time of her termination, she worked as a staff nurse in a surgical recovery room.

Plaintiff has headaches and pain all over her body, including her neck, shoulders, elbows, hands, hips, and ankles. She testified that she was diagnosed with fibromyalgia 20 years earlier "by Dr. Hugh (PHONETIC)..." who diagnosed fibromyalgia by a trigger-point

---

[3] In addition, the impairment must be one "which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423.

examination and by evaluating her blood work and symptoms. (Doc. #6, PageID at 102-03). Plaintiff worked during the 20-year period after that diagnosis. But her health deteriorated until she could no longer "work through it." *Id*., PageID at 103. She testified, "It just go to be I wasn't ... I couldn't sleep. I was hurting, I just wasn't sleeping." *Id*. When asked how fibromyalgia affected her mind, Plaintiff testified, "Well, when you hurt you don't rest and when you don's rest you don't sleep. I mean, it affects the concentration." *Id*. She further testified that she is "depressed a little bit but [she] thinks that's got to do with [her] fibro[myalgia] and [her] chronic fatigue and allergies." *Id*., PageID at 105.

Plaintiff described her pain as "really bad in the past 10 years...," and "continuous." *Id*., PageID at 106. When asked if her pain was "all day, every day, all over [her] body," Plaintiff answered, "Yes, sir, yes, sir." *Id*. On the zero to ten pain scale (zero equaling no pain; 10 being the worst pain she could imagine), Plaintiff estimated her pain level as "[u]sually between an eight and a nine." *Id*., PageID at 106. Medication dulls the pain but never eliminates it. Lying down is the most comfortable position for her. Plaintiff could walk only one block due to pain. She could stand for five to ten minutes. She could sit for three to five minutes; sitting was a "really bad position" for her. *Id*., PageID at 107-08. Pain prevents her from doing any type of work where she might be sitting most of the time. *Id*., PageID at 108. The most she can lift is about one gallon of milk (about eight pounds). She becomes short of breath when climbing stairs. When asked why she could not return to her past kind of work, she explained, "I can't lift, I can't stand, I can't sit, my concentration." (Doc. #6, PageID at 108). At the time of the ALJ's hearing, she could only walk 1 block due

4

to pain. She also has difficulty reaching due to "really bad" pain in her shoulders. *Id*.,
PageID at 117.

For treatment of fibromyalgia, Plaintiff takes "[q]uite a bid of pain medication." *Id*.,
PageID at 103. She takes pain medication about every three hours and needs to take less
pain medication when she is able to lie down for long periods of time. *Id*., PageID at 115.
Her medications make her "very, very sleepy." *Id*., PageID at 106. She has not been treated
with physical therapy, aqua therapy, and she has not seen a fibromyalgia specialist, a
rheumatologist. *Id*.

As to housework, Plaintiff testified that she does some laundry but does not do other
housework because "[i]t hurts." *Id*., PageID at 109. She goes to the grocery with her
husband and she will use the drive-thru to get her prescription meds at the drugstore. She
does not attend church, go to the movies, participate in sports, ride the bus, cook, wash the
dishes, do any gardening or yardwork, sweep, mop, or vacuum. *Id*., PageID at 108-09. She
only visits her mother but does not visit her friend. She sees her friend only when her friend
visits Plaintiff at her home. She likes to read, but she noted that it is hard to read in a lying
position. She is able to feed, dress, and groom herself.

On a typical day, Plaintiff gets out of bed between 4:00 a.m. and 9:00 a.m. She roles
out of bed because she is "really stiff." (Doc. #6, PageID at 111). She then lies down all
morning. She does not usually eat lunch. During the afternoon she "tries to read or watch
TV." (Doc. #6, PageID at 112). She estimated that she spends approximately 6 or 7 hours
lying down during the day. Plaintiff eats dinner in the evening, then will not do anything

5

different than during the day, unless she goes out for fast food with her husband. She typically dresses in sweat pants, as she did for the ALJ's hearing, to keep pressure off her joints. *Id.*, PageID at 113.

Plaintiff testified that she loved working as a nurse. When she was diagnosed with breast cancer (long before the ALJ's hearing), she continued to work the whole time even though she went through 36 radiation-therapy treatments. *Id.*, PageID at 117-18.

At the end of her testimony, Plaintiff explained to the ALJ, "I would give anything to have my health and to work. I enjoyed it, loved the people, it was my life." *Id.*, PageID at 118.

### B.    <u>Medical Source Opinions</u>

### 1.

Plaintiff began seeing Dr. Zagursky in 2006. In June 2008, Dr. Zagursky completed a Medical Source Statement noting she diagnosed Plaintiff with, in part, fibromyalgia, depression, and "CAP" (presumably, coronary artery disease). (Doc. #6, PageID at 86, 397). Dr. Zagursky listed Plaintiffs' medications (with prescribed doses) as including Evista, Effexor (an anti-depressant), Mirapex, Altace, Toprol XL, Neurontin, Ultram (for pain), and Parafon Forte (for pain), and others. *Id.*, PageID at 398. And Dr. Zagursky opined that Plaintiff's ability to perform sustained work activity is limited by fatigue and pain with activities and decreased strength. *Id.*

In April 2010, Dr. Zagursky answered interrogatories stating that she practices internal medicine and has "extensive experience treating patients with fibromyalgia and cfs

6

[chronic fatigue syndrome]." (Doc. #6, PageID at 673). She treated Plaintiff's fibromyalgia, chronic fatigue syndrome along with degenerative joint disease, chronic asthma, hypertension, irritable bowel syndrome, and gastroesophageal reflux disease.

Dr. Zagursky believed that the combination of Plaintiff's mental and physical impairments was greater than the sum of the parts. *Id.*, PageID 674. She explained that "concurrent symptoms and physically signs of above-stated diagnoses exacerbate underlying disease on ongoing basis." *Id.*, PageID 674-75. According to Dr. Zagursky, Plaintiff's chronic pain syndrome "worsened her ability to cope emotionally & physically." *Id.*, PageID 675.

Dr. Zagursky opined that Plaintiff was unable to be prompt and regular in attendance; respond appropriately to supervisors, co-workers, and customary work pressures; withstand the pressure of meeting normal standards of work productivity and work accuracy without significant risk of physical or psychological decompensation or worsening of her physical and mental impairments; sustain attention and concentration on her work to meet normal standards of work productivity and work accuracy; understand, remember, and carry simple work instructions without requiring very close supervision; behave in an emotionally stable manner; relate predictably in social situations; demonstrate reliability; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; complete a normal workday or workweek without interruption from psychologically and/or physically based symptoms and perform at a consistent pace without unreasonable numbers

7

and length of rest periods; respond appropriately to changes in a routine work setting; get along with co-workers or peers without unduly distracting them or exhibiting behavior extremes; sustain ordinary routine without special supervision; work in coordination with, or in proximity to, others without being unduly distracted by them; and accept instructions and respond appropriately to criticism from supervisors. (Doc. #6, PageID at 676-681).

Accepting that "Marked" means more than "moderate" and less than "Extreme," Dr. Zagursky believed that Plaintiff had a marked restriction in her daily activities and social functioning. *Id*., PageID at 681. She also had marked deficiencies of concentration, persistence or pace. *Id*., PageID at 682.

In a form titled, Medical Assessment Of Ability To Do Work-Related Activities (Physical), Dr. Zagursky opined that Plaintiff could lift/carry up to 5 pounds occasionally and less than 5 pounds frequently. She could stand/walk for less than 2 hours out of 8 and uninterrupted for 15 minutes. She could sit for 2 hours out of 8 and uninterrupted for less than 1 hour. *Id*., PageID at 684. She was never to climb, stoop, crouch, or crawl. She could occasionally balance and kneel. She was limited in her ability to reach and to push/pull. *Id*., PageID at 685. She was limited from heights, moving machinery, chemicals, temperature extremes, dust, noise, fumes, vibrations, and humidity. (Doc. #6, PageID at 686). And Plaintiff could not perform sedentary work activity. *Id*., PageID at 687.

**2.**

In July 2008, physician Dr. Manos reviewed the record at the request of the Ohio Bureau of Disability Determinations. Dr. Manos opined that Plaintiff could lift, carry, push

8

and pull up to 10 pounds frequently and up to 20 pounds occasionally; stand and/or walk for about 6 hours in an 8-hour workday; and sit for about 6 hours in an 8-hour workday. *Id.*, PageID at 444. This was consistent with light work, as defined by Social Security Regulation, 20 C.F.R. §404.1567(b).

Dr. Manos believed that Plaintiff had some postural limitations, such as frequent stooping and crouching, occasional climbing ramps/stairs, and never climbing ladders, ropes or scaffolds. (Doc. #6, PageID at 445).

On an undated form, physician Dr. Klyop reviewed Plaintiff's medical records and affirmed Dr. Manos's assessment without providing any analysis or reference to specific evidence. *Id.*, PageID at 467.

**3.**

In June 2008, Plaintiff saw psychologist Dr. Halmi who performed a psychological evaluation at the request of the Ohio Bureau of Disability Determinations. After interviewing Plaintiff and conducting a mental status examination, Dr. Halmi noted that Plaintiff "did not appear depressed or anxious, that she "presented as an honest and reliable informant," and he concluded, "Based on this evaluation, I do not have sufficient evidence to diagnose Ms. Davies with a psychological disorder. I opine that she is capable of completing an eight-hour work day from a strictly psychological perspective." (Doc. #6, PageID at 425). Dr. Halmi further opined that Plaintiff (1) was capable of "learning a simple, one or two step job"; (2) "it is likely that her somatic focus would interfere with her ability to complete routine tasks; however, this is more due to pain rather than psychological

impairment"; and (3) she would not have difficulty getting along with others. *Id.*, PageID at 426-27. Dr. Halmi also wrote:

> Ms. Davies' ability to withstand stress associated with day-to-day work activity is judged to be moderately impaired. Because of her pain level, I opine that she has a low frustration tolerance. She also avoids engaging in productive activities for fear of aggravating her pain. Again, this is more due to her pain level than any psychological condition. From a strictly psychological perspective, I opine that her mild depression would interfere with her ability to complete an eight hour work day, but would not prevent her from working a simple, low stress, repetitive job.

*Id.*, PageID at 427.

### 4.

In July 2008, psychologist Dr. Dietz reviewed Plaintiff's mental health records for the Ohio Bureau of Disability Determinations. *Id.*, PageID at 429-42. He checked a box indicating that Plaintiff did not have a severe impairment but elsewhere checked a box indicating that Plaintiff has the medically determinable impairment of depression. *Id.*, PageID at 429, 432. Dr. Dietz thought Plaintiff would have only mild limitations in her ability to complete daily activities, to maintain social functioning, and to maintain concentration, persistence, or pace. (Doc. #6, PageID at 439). After discussing Plaintiff's records and identifying what he thought were inconsistencies in Dr. Halmi's report, Dr. Dietz wrote:

> Weight is given to the narrative information in the CE [Dr. Halmi's] report, but I am unable to give his opinions any weight for the above noted problems. The diagnosis of depression is established from the PCCP [sic; presumably, Primary Care Physician] notes. There is not a psychological impairment present to interfere with the [claimant's] ability to work from a solely psychological perspective.

10

*Id.*, PageID at 441.

In December 2008, psychologist Dr. Waddell reviewed Plaintiff's medical records and affirmed Dr. Dietz's assessment without providing any analysis or any reference to specific evidence. *Id.*, PageID at 466.

## IV.    Administrative Review and the ALJ's Decision

Social Security Regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence. Although a dispositive finding at any Step may conclude the ALJ's review, *see also Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review answers five questions:

1.    Is the claimant engaged in substantial gainful activity?

2.    Does the claimant suffer from one or more severe impairments?

3.    Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4.    Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?[4]

5.    Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

---

[4] A person's "residual functional capacity" is an assessment of the most a person can do in a work setting despite his or her limitations. 20 C.F.R. §404.1545(a). A person's work setting requires work on a "regular and continuing basis," meaning 8 hours a day for 5 days a week. Social Security Ruling 96-8p at *1 1996 WL 374184; *see Howard v. Commissioner of Social Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

ALJ McNichols found as follows:

Step 1:  Plaintiff met the insured status requirements of the Social Security Act through December 31, 2012. She had not engaged in substantial gainful activity after June 25, 2007. (Doc. #6, PageID at 78).

Step 2:  Plaintiff had three severe impairments: "history of fibromyalgia and chronic fatigue syndrome and asthma." *Id*. Depression did not constitute a severe mental impairment for Plaintiff. *Id*., PageID at 80-82.

Step 3:  Plaintiff did not have an impairment or combination of impairments that meets or equals the level of severity described in the Listings, 20 C.F.R. Subpart P, Appendix 1.  *Id*., PageID at 82.

Step 4:  Plaintiff has the Residual Functional Capacity to perform a "medium work[5] ... except that she can never climb ladders, ropes, or scaffolds; she can only occasionally climb stairs; and she can stoop and/or crouch no more than frequently." (Doc. #6, PageID at 82)(footnote added). Plaintiff could perform her past relevant work as a Registered Nurse.[6] *Id*., PageID at 87.

Step 5:  Considering Plaintiff's age, education, work experience, and Residual Functional Capacity, jobs existed in significant numbers in the national economy that she could perform. This is so "even without considering past relevant work." *Id*., PageID at 87-

---

[5] Under the Regulations, "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds...." 20 C.F.R. §404.1567(c).

[6] The ALJ continued to Step 5 as an alternative to stopping at Step 4.

88.

The ALJ's findings throughout his sequential evaluation, led him to ultimately conclude that Plaintiff was not under a disability and hence not eligible for DIB.  (Doc. #6, PageID at 76-90).

## V.  **Judicial Review**

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Social Sec.*, 581 F.3d 399, 405 (6th Cir. 2009); *see Bowen v. Comm'r. of Social Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007). Reviewing the ALJ's legal criteria for correctness may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Social Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F3d at 746.

The substantial-evidence review does not ask whether the Court agrees or disagrees with the ALJ's factual findings or whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r of Social Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 406 (quoting *Warner v. Comm'r of Social Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). Substantial evidence consists of

13

"more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

**VI.**   <u>Discussion</u>

    **A.**    <u>The ALJ's Errors and Harmless Error</u>

**1.**

    Plaintiff contends that substantial evidence does not support the ALJ's finding that she could perform medium work with certain limitations. She points out that "[t]here is absolutely no medical opinion that supports his determination." (Doc. #9, PageID at 910).

    The Commissioner states, "While Drs. Manos and Klyop restricted Plaintiff to light exertional work, the ALJ found that ... medium work was more appropriate. While the Commissioner concedes that the ALJ's decision in this regard was made in error, and an RFC [Residual Functional Capacity] of light exertional work should have been given, the ALJ's error was harmless." (Doc. #11, PageID at 937-38).

    Before considering harmless error, the ALJ's medium-work error impacts his conclusion that Plaintiff could perform her past relevant work as a Registered Nurse. This is so because such work is classified as "medium work," according to the vocational expert who testified during the ALJ's hearing. (Doc. #6, PageID at 119). Consequently, if Plaintiff cannot do medium work, she cannot work as a Registered Nurse and substantial evidence does not support the ALJ's conclusion at Step 4 that she could perform such past relevant work. *Id.*, PageID at 87.

    This error, however, is not a fatal blow to the ALJ's decision due to the possibility

14

the error was harmless. To show harmlessness, the Commissioner points to the ALJ's explanation that "even if the claimant were limited to a reduced range of light work, she would still be able to perform a significant number of jobs in the national economy and would still be found 'not disabled.'" (Doc. #11, PageID at 938)(quoting Doc. #6, PageID at 86). In reaching this conclusion, the ALJ relied on the vocational expert's testimony that approximately 42,000 jobs were available to a hypothetical person who is able to perform light work with Plaintiff's limitations. (Doc. #6, PageId at 120-21).

The validity of the Commissioner's reasoning depends upon whether the ALJ's light-work hypothetical accurately described Plaintiff "in all significant, relevant respects ...." *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994). Indeed, "for a response to a hypothetical question to constitute substantial evidence, each element of the hypothetical must accurately describe the claimant." *Felisky*, 35 F.3d at 1036 (citations omitted). Reviewing the possible outcomes illuminates why this matters:

1.  The Commissioner's harmless-error argument is valid if substantial evidence supports the conclusion that Plaintiff could perform a limited range of light work. Harmless error would exist (a) because the vocational expert's testimony would be based on an accurate hypothetical, and (b) because the vocational expert's testimony would thus constitute substantial evidence in support of the ALJ's conclusion that Plaintiff could perform a significant number of light jobs that are available in the national economy.

2.      If substantial evidence does not support the conclusion that Plaintiff could

perform limited light work, then the ALJ's error is not harmless because the

vocational expert's testimony would not be based on an accurate hypothetical

and would not, as a result, suffice to show that Plaintiff could perform a

significant number of light jobs available in the national economy.

The issue, then, is whether substantial evidence supports the conclusion that Plaintiff

could perform a limited range of light work (as described in the ALJ's hypothetical to the

vocational expert).[7] The search for such substantial evidence begins with the medical source

opinions and ends with the ALJ's credibility finding.

## 2.

Plaintiff contends that the ALJ erred in rejecting her long-term treating physician Dr.

Zagursky's April 2010 opinion that she is able to perform only sedentary work. The

Commissioner argues, in part, that the ALJ provided good reasons for discounting Dr.

Zagursky's opinion, as the Regulations require, and the ALJ properly gave more weight to

opinions provided by Drs. Manos and Klyop, the record-reviewing medical sources.

Social security regulations recognize several different categories of medical sources:

treating physicians and psychologists, nontreating yet examining physicians and

---

[7] It should be noted that the ALJ merely assumed a scenario where Plaintiff could perform light work, rather than discussing the evidence he would adopt in support of such an alternative finding. *See* Doc. #6, PageID at 86.

psychologists, and nontreating yet record-reviewing physicians and psychologists. *See Gayheart v. Comm'r of Social Sec.*, 710 F.3d 365, 375 (6th Cir. 2013).

> As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a "nonexamining source"), and an opinion from a medical source who regularly treats the claimant (a "treating source") is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a "nontreating source"). In other words, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker."

*Id.*, 710 F.3d at 375 (quoting, in part, Social Sec. Ruling No. 96–6p, 1996 WL 374180 at *2)(other citations omitted).

A treating source's opinion is given controlling weight under the treating-physician rule only if it is both well supported by medically acceptable data and not inconsistent with other substantial evidence of record. *Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. §404.1527(c)(2)). "If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence." *Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)-(6)).

The ALJ correctly described the legal criteria embodied in the treating physician rule and correctly listed the regulatory factors applicable when the treating physician rule does not apply. *See* Doc. #6, PageID at 86-87. The ALJ then rejected Dr. Zagursky's opinions, in part, as follows:

17

[T]he undersigned finds that Dr. Zagursky's opinion is not entitled to controlling or deferential weight under the Regulations. The undersigned gives little weight to her assessment as it is unsupported by objective findings. As discussed above, the record contains little objective evidence supporting the fibromyalgia and CFS diagnoses. Further, Dr. Zagursky's treatment notes primarily reflect the claimant's subjective complaints of muscle aches and fatigue and contain few, if any, objective examination findings that would support a conclusion that the claimant is unable to sustain even sedentary work activity. It appears, therefore, that Dr. Zagursky relied quite heavily on the claimant's subjective report of symptoms and limitations and seemed to uncritically accept as true most, if not all, of what the she reported. Yet, as explained elsewhere in the decision, good reasons exist for questioning the reliability of the claimant's subjective complaints. The totality of the medical evidence clearly supports that the claimant is not as severely limited as assessed by this doctor.

(Doc. #6, PageID at 87).

The ALJ's evaluation of Dr. Zagursky's opinion is based on a fundamental misunderstanding of fibromyalgia. The ALJ's misunderstanding led him to overemphasize the presence of "little objective evidence" in support of Plaintiff's fibromyalgia diagnosis. "[U]nlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs. Rather, fibromyalgia patients 'manifest normal muscle strength and neurological reactions and have a full range of motion.' The process of diagnosing fibromyalgia includes (1) the testing of a series of focal points for tenderness and (2) the ruling out of other possible conditions through objective medical and clinical trials." *Rogers v. Comm'r of Social Sec.*, 486 F.3d 234, 243-44 (6th Cir. 2007) (quoting, in part, *Preston v. Sec'y of Health & Human Servs.,* 854 F.2d 815, 820 (6th Cir. 1988) (per curiam) and citing *Swain v. Comm'r of Social Sec.,* 297 F.Supp. 2d 986, 990 (N.D. Ohio 2003) (observing that "[f]ibromyalgia is an 'elusive' and 'mysterious' disease"

18

which causes "severe musculoskeletal pain")). Perhaps, as the Commissioner suggests, the ALJ's reference to little objective evidence of fibromyalgia is based on Social Security Ruling 12-2p, 2012 WL 3104869, which describes the evidence needed to establish that a person has a medically determinable impairment of fibromyalgia. *Id*. at *1. Even if the substance of this Ruling supports the ALJ's decision (which is questionable in some respects), the Ruling does not apply to the ALJ's decision in this case for the simple reason that it did not become effective until July 25, 2012, well after the ALJ's decision on February 14, 2011. Rather than this Ruling, the ALJ's 2011 decision was subject to well-established Sixth Circuit case law regarding fibromyalgia – namely, *Rogers*, 486 F.3d at 243-44 (a 2007 decision) and *Preston*, 854 F.2d at 820 (a 1988 decision). And it was contrary to the Sixth Circuit's recognition in those cases that objective tests are of little relevance in determining the extent or severity of fibromyalgia. *See Rogers*, 486 F.3d at 243-44; *Preston*, 854 F.2d at 820.

## 3.

The ALJ also rejected Dr. Zagursky's opinion based on his conclusion that Plaintiff's descriptions of her pain lacked credibility. In reaching this conclusion, the ALJ was influenced by his mistaken premise that objective evidence must exist to support a fibromyalgia diagnosis. This is an insufficient basis for finding Plaintiff's pain testimony as lacking credibility. *See Rogers*, 486 F.3d at 248.

An additional concern arises because the ALJ relies on Plaintiff's daily activities to discount her pain testimony and, in turn, to reject Dr. Zagursky's opinions. Although "an

ALJ's findings on credibility are to be accorded great weight and deference, particularly

since an ALJ is charged with the duty of observing a witness's demeanor and credibility...,

an ALJ's assessment of a claimant's credibility must be supported by substantial evidence."

*Walters v. Comm'r of Social Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) (citations omitted).[8]

The ALJ relied on Plaintiff's statements to Dr. Halmi that she took care of her

personal hygiene and other personal needs without assistance, washed dishes, did laundry,

handled money, regularly visited her parents, talked to her friends on the telephone, read,

and shopped. (Doc. #6, PageID at 85). But the ALJ's decision, *id.*, PageID at 85, 86, does

not recognize that Dr. Halmi found Plaintiff to be "an honest and reliable informant...." *Id.*,

PageID at 425. Overlooking this statement was error in the context of this case because the

"ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence

that supports his position." *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000); *see Switzer v.*

*Heckler*, 742 F.2d 382, 385-86 (7th Cir. 1984); *Kuleszo v. Barnhart*, 232 F.Supp. 2d 44, 57

(S.D.N.Y. 2002).

The ALJ's decision also failed to recognize that Dr. Halmi listed the daily activities

Plaintiff acknowledged she could perform without indicating that he questioned Plaintiff

about the extent she could perform those daily activities. Similarly, the ALJ did not question

Plaintiff about the extent she could perform daily activities. Such was necessary, as in

*Rogers*, because Plaintiff's "somewhat minimal daily activities are not comparable to

---

[8] *Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994) sets forth the well-established
standards for judicial review of an ALJ's credibility findings.

typical work activities." *Rogers*, 486 F.3d at 248 (footnoting, "Typical or basic work activities refer to "the abilities and aptitudes necessary to do most jobs," including among other things "walking, standing, sitting, lifting, pushing, pulling, reaching carrying, or handling. 20 C.F.R. §416.921(b)"; *see* §404.1521(b) (same)).

Next, a comparison between page six of Dr. Halmi's report and Plaintiff's testimony reveals many consistencies such as her ability to shop using the drive-thru, her inability to cook, her talks on the phone with friends, and her visits with her mother. *Compare* Doc. #6, PageID at 425 *with* PageID at 108-110. The evidence, moreover, that Plaintiff enjoys reading is consistent when comparing Dr. Halmi's report and her testimony. *Compare id.*, PageID at 425 *with* PageID at 110. The ALJ also did not consider that Plaintiff's ability to read was limited by her need to do so lying down. *Id.*, PageID at 110. And, as Plaintiff correctly points out, the ALJ identified generally passive activities that do not require any significant exertion, let alone exertion that conflicted with Plaintiff's statements to Dr. Halmi or exertion that otherwise negatively impacted her credibility.

The ALJ also discounted Plaintiff's pain testimony due to her limited treatment history including the fact that she has never seen rheumatologist. *Id.*, PageID at 84. Yet the lack of treatment by a pain specialist does not necessarily indicate that Plaintiff's pain levels were less than she described. It is equally likely that Dr. Zagursky's "extensive experience in treating patients with fibromyalgia and CFS," *id.*, PageID at 673, obviated the need for consultation or treatment by a rheumatologist. Given this experience, which the ALJ did not recognize, Plaintiff's lack of a rheumatologist would not cast doubt on her credibility, as the

ALJ concluded.

Lastly, the ALJ also overlooked or ignored Plaintiff's testimony that tends to show she is not a person to shirk working simply because she feels sick or injured. Plaintiff's earning records show that she worked throughout much of her adult life. *See* Doc. #6, PageID at 212-16. She worked as a Registered Nurse for nearly 20 years before her asserted disability onset in June 2007. And, as an example of her tenacity and dedication, Plaintiff's unrebutted testimony establishes that she worked as a nurse during the whole time she underwent 36 radiation treatments for breast cancer. *Id.*, PageID at 117-18. A commendable as this is by itself, it also lends credence to her final statement to the ALJ: "I would give anything to have my health to be able to work. I enjoyed it, I loved the people, it was my life." (Doc. #6, PageID at 118).

For all these reasons, substantial evidence does not support the ALJ's reliance on Plaintiff's daily activities as a basis for rejecting her pain testimony and, in turn, for rejecting her treating physician Dr. Zagursky's opinion. *See Cole v. Astrue*, 661 F.3d 931, 939 (6th Cir. 2011) ("the ALJ's focus on the claimant's ability to do certain activities in discounting the treating source's opinion does not constitute 'good reasons' for doing so when the claimant's testimony and other record evidence contradict the ALJ's finding.")(citation omitted).

Accordingly, Plaintiff's Statement of Errors is well taken.[9]

---

[9] In light of the above discussion, and the resulting need to reverse the ALJ's decision, an in-depth analysis of Plaintiff's remaining challenge to the ALJ's decision is unwarranted.

### B.    <u>Reversal And Remand For Benefits</u>

If the ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for further proceedings or to reverse and order an award of benefits. Under Sentence Four of 42 U.S.C. §405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Sec'y of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994).

A reversal of the ALJ's decision and a judicial award of benefits is warranted in the present case, because the evidence of disability is strong while contrary evidence is weak. *See Faucher*, 17 F.3d at 176. A combination of many reasons supports this conclusion. First, the ALJ erred in finding that Plaintiff could perform a limited range of medium work. Second, the ALJ rejected Drs. Manos' and Klyop's opinions concerning Plaintiff's ability to lift and carry weight at the light exertional level, thus leaving Dr. Zagursky's opinion unrebutted that Plaintiff could not perform the lifting/carrying requirements of sedentary work.[10] (Doc. #6, PageID at 683-87). Third, the ALJ did not rely on Drs. Manos and Klyop

---

[10] The ALJ partially credited the opinions of Drs. Manos and Klyop but only as to Plaintiff's postural limitations: "never climb ladders, ropes, or scaffolds; she can only occasionally climb stairs; and she can stoop and/or crouch no more than frequently." (Doc. #6, PageID at 82, 85-86).

as an evidence to reject Dr. Zagursky's opinion that Plaintiff could not perform the lifting/carrying requirements of sedentary work and was otherwise limited. Fourth, neither Dr. Manos nor Dr. Klyop considered Dr. Zagursky's 2010 opinion because their review of Plaintiff's medical records occurred before Dr. Zagursky provided her 2010 opinions. Fifth, Dr. Zagursky, Plaintiff's long-time treating physician, based her opinions on more extensive medical evidence than the relatively few documents reviewed by Drs. Manos and Klyop, as detailed by Plaintiff. *See* Doc. #12, PageID at 948 (and record citations therein). Sixth, even Dr. Manos believed it appropriate to give some weight to Dr. Zagursky's June 2008 opinions (with the added notation, "although vague"). (Doc. #6, PageID at 450). Seven, Dr. Klyop provided no explanation or discussion of specific evidence in support of his one-sentence affirmation of Dr. Manos' opinions. *Id*., PageID at 467. Eighth, substantial evidence does not support the ALJ's finding that Dr. Zagursky was "unqualified," *id*., PageID at 81, 87, to opine about Plaintiff's mental work abilities, particularly when it is unrebutted that Dr. Zagursky had extensive experience in treating patients with fibromyalgia. (Doc. #6, PageID at 673). Lastly, as Plaintiff points out, the vocational expert testified that if a person was limited as described in the ALJ's hypotheticals, including a limitation to sedentary work, then she would have no transferable skills and she would be disabled. *See id*., PageID at 121-22; *see also* Doc. #8, PageID at 909. For all these reasons, and considering Plaintiff's medical records, including the credible and controlling findings and opinions of her long-term treating physician Dr. Zagursky, the evidence of disability is overwhelming or, at a minimum, is strong while contrary evidence is weak.

24

Accordingly, an Order remanding this case for benefits is warranted.  *See Faucher*,

17 F.3d at 176; *see also Felisky v. Bowen*, 35 F.3d 1027 (6th Cir. 1994).

## IT THEREFORE IS RECOMMENDED THAT:

1. The Commissioner's final non-disability decision be reversed;

2. Plaintiff Pamela Davies' case be REMANDED to the Social Security Administration for payment of Disability Insurance Benefits consistent with the Social Security Act; and

3. The case be terminated on the docket of this Court.


November 6, 2013                              _____s/Sharon L. Ovington_____
                                                        Sharon L. Ovington
                                             Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981).